COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

MIDDLESEX SUPERIOR COURT
Civil Action No.



22-3396

| | |
|---|---|
| MARLBOROUGH FIREFIGHTERS ASSOCIATION, LOCAL 1714, I.A.F.F. and WILLIAM S. TAYLOR, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| THE CITY OF MARLBOROUGH, KEVIN BREEN and ARTHUR VIGEANT, | ) ) ) |
| Defendants. | ) ) ) |

**RECEIVED**

**9/16/2022**   HG

## COMPLAINT AND JURY DEMAND

As for their suit against Defendants the City of Marlborough, Kevin Breen and Arthur Vigeant, Plaintiffs Marlborough Firefighters Association, Local 1714, I.A.F.F. and William S. Taylor hereby state as follows:

### Introduction

1. Defendants are a municipality and municipal officials who have engaged together in impermissible retaliation and who have attempted to interfere with, and interfered with, Plaintiffs' exercise and enjoyment of rights secured by the constitution and laws of the United States and the Commonwealth of Massachusetts, including Plaintiffs' right to free speech, entitling Plaintiffs to relief pursuant to 42 U.S.C. § 1983 and Mass. Gen. Laws ch. 12, §§ 11H & 11I. More specifically, Plaintiffs are a public employee union and its long-time President who have been targeted repeatedly for adverse actions by Defendants when they speak out on certain matters with which the officials disagree.

-1-

2.      For example, Defendants terminated the union president from his employment when, out of his sense of respect for a deceased, he wore a "Class A" dress uniform to the funeral of a fellow firefighter. Defendants took these actions despite well-established First Amendment prohibitions against restricting free speech in the form of clothing worn with an intent to convey a particularized message to those who view it. Taken in the context of a funeral, donning a "Class A" dress uniform radiates and was intended here to radiate a message of respect, solidarity, loyalty, and dedication to duty. The values are clear and easily understood by the public in the context of a funeral. Such symbolism is well-established as a form of protected expression.

3.      Defendants would not have taken adverse action against the union and its president but for their protected expression at issue. Defendants have also excluded the president of the union from a public meeting space based upon the viewpoints that he has expressed, including on behalf of the union, in contravention of constitutional protections. Plaintiffs are entitled to money damages and injunctive relief.

**The Parties**

4.      Plaintiff Marlborough Firefighters Association, Local 1714, I.A.F.F. (the "Union") is an employee organization within the meaning of Mass. Gen. Laws ch. 150E, §1 with a principal place of business in the City of Marlborough, Middlesex County, Massachusetts.

5.      Plaintiff William S. Taylor ("Taylor") is an individual and resident of the Town of Hudson, Middlesex County, Massachusetts.

6.      Defendant the City of Marlborough (the "City") is a municipal corporation located in Middlesex County, Massachusetts.

7.      Defendant Kevin Breen ("Chief Breen") has been the Fire Chief of the City, from July 2015 to the present. He is sued in his individual and official capacities.

-2-

8. Defendant Arthur Vigeant ("Mayor Vigeant") has been the Mayor of the City, from approximately 2011 to the present. He is sued in his individual and official capacities.

**Factual Background**

9. The Union is the exclusive bargaining representative for individuals employed by the City in the City's Fire Department (the "Department"), in the rank of uniformed, full time, permanent members of the Department, including the rank of firefighter (or private), lieutenant, captain, and battalion chief, but excluding Fire Chief, and excluding the assistant chief which was added to the Department's rank structure during the term of a three-year collective bargaining agreement (the "CBA") that took effect on July 1, 2015.

10. Taylor was hired by the City as a firefighter in 1986 and was promoted to lieutenant in 2017. He has continued in the rank of lieutenant from 2017 until April 6, 2022 when the Mayor (at the Chief's recommendation) demoted Taylor from the rank of lieutenant to the rank of firefighter and terminated his employment.

11. Taylor served as President of the Union for the past thirty-one years, from 1991 to the present, excluding only the period from 2003 to 2006. Taylor otherwise served as a Union Officer and/or Union Executive Board Member including from 1988 to 1990 as shift representative, in 1990 as vice president, and from 2004 to 2005 as vice president.

12. As President of the Union, including during the term of Chief Breen, Taylor has been a member of the Union's contract negotiating committee for all contracts; filed numerous grievances; advanced several grievances to arbitrations; engaged in communications with Chief Breen and the Assistant Chiefs, about terms and conditions of employment of bargaining unit members; and advocated for the rights of the bargaining unit about a wide array of subjects in communications with Chief Breen and Mayor Vigeant.

*Union and Non-Work-Related Speech on Work Time*

13.     On work time from at least 1988 to the present (a 34 year period): (a) Union officers, including the Union President, prolifically engaged in First Amendment protected activity by communicating to members of the bargaining unit about collective bargaining issues, grievances, and other concerns relating to terms and conditions of employment; (b) members of the bargaining unit prolifically engaged in First Amendment protected activity by communicating about such Union issues and making inquiries of Union officers; and (c) members of the bargaining unit prolifically engaged in other activities unrelated to the performance of their job functions including, *e.g.*, communicating about fund raising, selling personal property, asking retirement questions, discussing or announcing parties, weddings, and other social events.  Sometimes the communications involved using Department resources such as paper or posting on a Department bulletin board.

14.     On work time from approximately 1995 (if not earlier) to the present, the City has had an email system and assigned email addresses to all members of the Department, including those that also served as Union officers. During this time, the email system was used prolifically as follows: (a) by Union officers, including the Union President, to engage in First Amendment protected activity by communicating to members of the bargaining unit about collective bargaining issues, grievances, and other concerns relating to terms and conditions of employment; (b) by members of the bargaining unit to engage in First Amendment protected activity by communicating about such Union issues and making inquiries of Union officers; and (c) by members of the bargaining unit to engage in other activities unrelated to the performance of their job functions for the Department including, *e.g.*, communicating about fund raising for charities and other organizations, selling personal property, asking retirement questions, discussing parties, weddings,

-4-

and other social events. Nevertheless, the use of email by the Union President, Taylor, in October 2021 and January 2022, was terminated by the City, as described below.

15.     Staff of the Department are directed to access email two times a day.

16.     Taylor has been elected as a member of the City's Retirement Board every three years from 1996 to the present, as he concurrently held the office of President of the Union or Union officer, and a member of the Department.

17.     From 1996 to May 2016, Taylor routinely attended Retirement Board meetings in the morning, on the last Tuesday of each month. The duration of the meetings was typically one to two hours. When Taylor was scheduled to work on the day of the Retirement Board meeting, Taylor typically contacted the shift commander on the prior day and advised that he needed to be released from duty for the period of the Retirement Board meeting, and that the Department would need to secure coverage for him during that period. Where the Department was at minimum staffing on the day of the meeting, this meant the Department would pay overtime to a member who covered for Taylor during Taylor's time at the Retirement Board meeting.

18.     Likewise, from at least 1996 to May 2016 the Union office was located in the City's Central Fire Station.

19.     On May 9, 2016, the Mayor advised the Union that Taylor would no longer be able to attend Retirement Board meetings on work time, and that the Union office must be relocated off City property.

20.     On June 7, 2016, Union counsel objected to the above-described directives from the Mayor, and shortly thereafter the Mayor rescinded the directives.

21.     Accordingly, from in or about June 2016 to the present, Taylor continued to attend Retirement Board meetings and typically notified the shift commander the prior day about the

potential need for coverage while he was at the meeting, and the Union office remained in the City's Central Fire Station.

***Investigation of Taylor's Exercise of Free Speech Rights in January 2018 Regarding the So-Called "Ass Chief" Email***

22.    For several weeks prior to January 25, 2018 the City engaged in a new non-Civil Service process to hire firefighters. This was the first time that a non-Civil Service hiring process was used to hire firefighters since it was adopted in the CBA in effect from 2015 through 2018.

23.    There was a hiring committee that included Union and City representatives involved in the initial screening of applicants for firefighter, per agreement between the Union and the City. The Union representatives on the hiring committee were Taylor, Lt. Mike Peckham, and Firefighter Steve Cavallo. The City representatives consisted of the two Assistant Chiefs, appointed in or about 2017, Frederick Flynn and Jeffrey Gogan.

24.    The hiring committee reviewed over 100 applicants; reduced this number to approximately 60 candidates, and interviewed those candidates; and following the interviews derived a list of 20 finalists. The hiring committee forwarded its unranked list of the 20 finalists to the Chief for further consideration and interviewing by the Chief.

25.    At each interview of the candidates by the hiring committee, a facilitator hired by the Chief named Mike Wallace ("Wallace") spoke and told each candidate initial information. In that regard, among other things, Wallace told each candidate they would remain on the list for two years, regardless of whether they were selected by the Chief for hire in the current round of hiring.

26.    In or about January 2018, the Union learned that the Chief decided to offer employment as firefighter to 11 of the 20 individuals on the list transmitted to the Chief by the hiring committee, and that the Chief did so in violation of the agreement and commitment he made to the Union in two respects as follows: (a) the Chief did not confer with the full hiring committee in making the final decision, but only his two Assistant Chiefs; and (b) the Chief discarded the list

-6-

of non-selected candidates for consideration in the next round of hiring, rather than retaining the list for two years, not only in violation of the agreement with the Union, but also at odds with what the Chief's hand-picked facilitator, Wallace, told each candidate at the outset of the hiring committee's interview of each applicant.

27.     Taylor considered this action of Chief Breen a violation of the agreement between the Union and the City about the hiring process, and believed it contradicted the two-year list information Wallace provided to each applicant during the hiring committee's interview.

28.     In this context, Taylor wrote and sent an email on the morning of January 25, 2018, expressing objection and outrage about these concerns only to the Chief, and the four other members of the hiring committee (two Assistant Chiefs, and two Union representatives). Taylor did not send the email to others in the Department.

29.     In the email, Taylor used language that was forceful, expressed anger, and referred to the Assistant Chiefs by the abbreviation "Ass Chiefs." The email read as follows:

Chief Breen

Ass Chief Flynn

Ass Chief Gogan

As a member or apparently now, a former member of the selection committee I feel compelled to voice my extreme disappointment with the way you have conducted the final phase of the selection process.

Please understand that I am not advocating for or against any particular candidate but only the process which we were lead to believe would be a legitimate replacement for Civil Service. In the end it was not!

1. Chief Breen indicated on more than one occasion that he would hire the best candidates not just previously trained out of town candidates from other departments. That was a lie!

2. Chief Breen said the full committee would meet to compare rankings before making final decisions. That was a lie!

-7-

3. Chief Breen chose instead to meet only with the two Ass Chiefs from the committee, make conditional offers and withhold all information from the other members of the committee, leaving them completely out of the final phase of the process.

4. The entire hiring process has been unnecessarily compromised leaving the stench of impropriety with candidates and committee members alike!

The three of you have deviated from the process originally outlined by Mike Wallace sufficiently enough to leave candidates with a good case at the Dept. of Labor Relations. You not only ignored and withheld information from three members of the selection committee, but you didn't even follow the procedure that was explained to each candidate when they appeared before us in the interview process. Any one of them could get this entire list thrown out, not only making the three of you look like idiots, but also destroy the overtime budget for another year! Good job!!

William S. Taylor, President

Marlborough Firefighters

Local 1714 IAFF

30.     On January 25, 2018, after receiving the above-quoted email, Chief Breen entered the conference room area where Taylor was present with Battalion Chief Brian Gould, Captain Scott Clemmer, and a few others, all of whom had just completed training.  Chief Breen entered abruptly, pointed his finger at Taylor and yelled: "My office now!"

31.     Taylor followed Chief Breen to the Chief's office.  Taylor paused at the doorway of the office and asked whether the Chief wanted to defer the conversation to another time given that the Chief appeared so angry. The Chief dismissed the request and shouted at Taylor several times: "Ass Chief! Really!  Ass Chief!" The Chief then asked "why did you send this and to whom?"

32.     Taylor responded with words to the effect: "I sent the email only to the hiring committee, the two Assistant Chiefs and two Union members.  We discussed this and you lied to us. By you lying to us, you caused us to lie to the others at the interview.  If you read Mike Wallace's notes, he captures every single word that was said to each candidate, and that includes

the comment that if the candidate was not selected in this round, they would be kept on a list for the future consideration for two years. But you are not keeping the list."

33.    The Chief shouted in response, words to the effect: "I disagree! You don't know what you are talking about! You did not see what I did! You can leave now!" The Chief pointed to the door and Taylor left.

34.    One hour later the Chief summoned Taylor back to the Chief's office and instructed Taylor to come with a Union representative. Taylor arrived with a representative. The Chief gave Taylor paperwork placing him on paid administrative leave, and told Taylor that he (the Chief) was placing him (Taylor) on paid administrative leave pending investigation.

35.    Taylor was never informed of the outcome of the "investigation," returned to work on Sunday January 28, 2018 and was issued a counseling notice dated March 19, 2018 relating to this.

36.    At the time, Taylor perceived this as an isolated event, and did not take formal action against the City about Chief Breen's treatment of him in this regard.

### *Investigation of Taylor's Exercise of Free Speech Rights in June 2021 Regarding Firefighter Ronald Percy*

37.    On June 21, 2021, there was a further exchange of emails between Taylor and Chief Breen relating to the return to work of Firefighter Ronald Percy ("Percy").

38.    Taylor signed his email as President; challenged the City's Human Resources Director's handling of Percy's return to work; and in doing so raised the City's similar poor handling of another issue involving Firefighter James Diamond that was pending grievance and eventual arbitration.

39.    The Chief responded and told Taylor he "crossed a line which has been clearly marked out for you in previous instances." The Chief said "never again send a disrespectful and

insubordinate communication to me or another member of the management team." The Chief told Taylor "your conduct in this matter is now under review."

40.     Taylor was not informed of the outcome of any such "review" and no discipline was issued to Taylor following this interaction.

### Investigation of Taylor's Exercise of Free Speech Rights in October 2021 Regarding Criticism of the Chief in the So-Called "Bomb-Drop" Email

41.     In or about July 2021, Chief Breen transferred personnel in a manner that the Union believed was unsafe, and violated the collective bargaining agreement and past practice. A grievance was filed and is currently pending arbitration.

42.     On October 21, 2021, Assistant Chief Gogan ("Gogan") sent an email to the members of the Department about additional transfers. The Union appreciated Gogan's email, believing it to be consistent with safety, as well as the collective bargaining agreement and past practice. Taylor responded to Gogan's email; expressed appreciation for the manner in which he handled the transfer communication; and also criticized Chief Breen for the manner in which the Chief handled the transfers in July 2021 that were the subject of a pending grievance. In that regard Taylor referred to the Chief's July 2021 transfers as a "bomb drop," expressed safety concerns arising from the Chief's actions undermining "crew integrity," and demanded that the process entail "Seniority, Courtesy, and Respect!" Chief Breen then responded by email.

43.     In the days preceding October 20, 2021, a firefighter with nearly forty years of service, Joe Vento, was retiring. Firefighter Vento's last day on the job was to be October 20, 2021, and there were plans that day for a festive bid of farewell and congratulations to Firefighter Vento.

44.     Chief Breen issued an email that day. In the email the Chief disregarded the retirement of Firefighter Vento, discussed himself and his long tenure in fire service, and mentioned that he had made a decision about the hiring of a new Assistant Chief but could not

-10-

provide any further information until after the background and other pre-employment screening was completed.

45.     In this context, on October 20, 2021, Taylor was concerned that the Chief sent an email to discuss the Chief's own background and mention an incomplete hiring process relating to an Assistant Chief but ignored the momentous occasion of Firefighter Vento's retirement and last day on the job. Taylor replied and criticized the Chief for his communication that distracted from the retirement of "one of our members," signing as Union President.

46.     On Friday, October 22, 2021, Chief Breen summoned Taylor to report to the Central Fire Station and to have a Union representative present. Taylor reported to the station and met with Chief Breen, Assistant Chief Gogan, and Union Vice President Dana Soroka at about 11:00 a.m.

47.     At the meeting, the Chief advised Taylor of his statutory rights under *Garrity v. New Jersey*, 385 U.S. 493 (1967). The Chief then discussed the Mayor's letter dated May 9, 2016 to Taylor where the Mayor directed Taylor not to attend Retirement Board meetings on work time and to move the Union office off City property. Chief Breen held the letter in the air and said that Taylor was violating this directive.

48.     The conversation continued with the Chief addressing his accusation that Taylor took time off without authorization.

49.     The Chief then turned to the subject of the email that Taylor had just sent to the Chief about one hour earlier. In that regard, the Chief handed Taylor a document prohibiting Taylor's use of the Department's email systems stating, among other things, "You are advised to refrain from participating in any activity that violates our rules and regulations as doing so may subject you to further disciplinary review." The document further stated "Specifically, I am ordering you to refrain from sending any emails using the department's email system. Your access to and use of the city's email system is under review."

50.   In conjunction with handing Taylor the above-quoted document, the Chief also gave Taylor a copy of the email in question. Among other things, the Chief told Taylor: "There is also the issue of your use of the City email." The Chief said: "The intent of your email is decided by the recipient, not by you." The Chief further said: "Several of your members have taken offense to your emails, and I have guys coming to me and telling me that. You are relieved from duty. I am ordering you escorted from duty pending investigation."

51.   Taylor then left the meeting, was placed on administrative leave, and was escorted away. As Taylor was escorted away, the entire shift of firefighters was present, including those assigned to Ladder 1, Rescue, and Engine 1, as well as Engine 2. Also, as Taylor was escorted away an announcement was made through the paging system that the Department needed coverage.

52.   After the Friday meeting described above, the Chief directed a Battalion Chief to call Taylor over the weekend -- prior to Taylor's planned Monday vacation day -- to advise Taylor that Taylor was ordered to return to work on Monday. By issuing this directive, the Chief ensured that Taylor's day off on Monday would result in Taylor using a vacation day, rather than Taylor having the day off on paid administrative leave pending the investigation referenced by the Chief during the Friday meeting.

53.   Taylor was not informed of the outcome of any such "investigation" and no discipline was issued to Taylor following the meeting with the Chief Friday October 22, 2021 described above until the Mayor (at the recommendation of the Chief) terminated the employment of Taylor effective April 6, 2022.

54.   The City did not give notice or opportunity to bargain in connection with changing past practice relating to Taylor's use of email or attendance at Retirement Board meetings on work time as described above. This departure from the expectable procedure reflects bad faith on the part of the City and demonstrates the City's retaliatory animus.

***Investigation of Taylor's Exercise of Free Speech Rights in January 2022 Regarding the So-
Called "Strong Work Chief" Email and a Notation on a File***

55.     Taylor's normal assignment in the past several years has been as Lieutenant at Station 2, working 24-hour shifts in a pattern of consecutive days described as "1-2-1-4." The "1" in the sequence signifies the 24-hour shift the firefighter is working, and the "2" and "4" indicate the number of consecutive 24-hour periods off. Accordingly, a "1-2-1-4" schedule means an eight day sequence of one day on duty; two days off duty; one day on duty; four days off duty.

56.     Due to Taylor suffering an injury a few months prior to May 2021, Taylor's assignment was changed from the above-described 24-hour shifts in a pattern of 1-2-1-4, to an administrative assignment at Central Station on the day shift, Monday through Friday. Taylor was assigned to work in the "arson" office, an office that was locked and which only Taylor and a handful of other Department members routinely accessed.

57.     While in this administrative assignment, pending recovery from his injury, Taylor brought manilla folders containing non-work related matters, such as relating to the affairs of the Union and the Retirement Board. These folders were Taylor's personal property, and unrelated to the administrative work he was performing in the arson office.

58.     Taylor was scheduled for vacation to start on May 13, 2021 through May 21, 2021, and then to return to work in his regular assignment working 24-hour shifts on May 24, 2021. Friday May 21, 2021 was a very important day for Taylor; it was the day he was getting married, and the vacation time from May 13, 2021 onward allowed for time off in the days immediately prior to his marriage.

59.     Taylor had communicated with Chief Breen and his Administrative Assistant Heather Clark about his vacation request for days off prior to the date of his marriage on Friday May 21, 2021. There was a dispute about the vacation where the Chief wanted to charge Taylor's vacation accrual for more days than required to ensure the days off, and about his date of return.

-13-

The dispute related to how vacation days are charged for administrative assignment versus firefighters in a 24-hour shift. This dispute was only with Chief Breen. Taylor did not have a dispute with Chief Breen's administrative assistant, Clark, about this. In fact, Taylor has known Clark for more than 20 years and has had a good work relationship with her.

60.     In or about May 2021, when the dispute was being resolved about his return date from vacation and number of vacation days he would be charged, Taylor wrote a note on the cover of a manilla folder that he used for Retirement Board and/or Union correspondence, stating his vacation days and the date he was returning to work a 24 hour shift including the phrase "C U Next Tuesday."

61.     When Taylor left the arson office on May 12, 2021, for his last shift in that position, before returning from vacation on May 24, 2021, Taylor intended to collect all of the folders that contained material relating to non-work matters, including Union and Retirement Board business. Taylor inadvertently left materials behind, including the folder with the above-quoted handwritten comment on it.

62.     Taylor was not questioned about the above-referenced folder until nine months later in January 2022, as explained below.

63.     In the meantime, during the pendency of the COVID-19 pandemic, for several months prior to December 29, 2021, Taylor expressed support for the City issuing a mask mandate, and even a vaccine mandate, to prevent the spread of Covid-19.

64.     On December 29, 2021, Assistant Chief Gogan sent an email to Department staff announcing General Order 21-15 which required "face coverings . . . regardless of vaccination status."

65.     On December 29, 2021, Taylor replied by email stating: "Strong work Chief!"

-14-

66.     On Thursday January 13, 2020, Taylor was called in the afternoon to report to Central Station and to bring a Union representative. Taylor responded to Central Station with Union Vice President Dana Sorka.

67.     Upon arriving at Central Station at about 5:00 p.m., Taylor went to the classroom for a meeting, as directed.

68.     The meeting was attended by Taylor, Chief Breen, Sorka, and Battalion Chief Brian Gould.

69.     Chief Breen began the meeting by reading Taylor his *Garrity* and other rights.

70.     Chief Breen then handed Taylor a photo-copy of the manilla folder that contained the handwritten notations about his vacation and return to work seven months earlier in May 2021. Chief Breen asked Taylor to confirm that it was Taylor's handwriting, and Taylor confirmed it was.

71.     Chief Breen asked Taylor whether he recalled speaking to the Chief's Administrative Assistant, Clark, about his vacation schedule, and Taylor confirmed he recalled this.

72.     Chief Breen asked Taylor, do you know that your notes are an acronym for a derogatory expression, and Taylor confirmed he was aware of this.

73.     Chief Breen then asked Taylor whether Taylor intended to refer to Ms. Clark with that expression. Taylor responded and stated words to the effect: "No Chief. I take extreme objection to that, and I am hurt that you would think I left that for Heather. You know Chief that I have had a friendly relationship with Heather going back more than 20 years, well before you started working here."

74.     Chief Breen then asked whether Taylor wrote that because of the discussion he had with Ms. Clark about how the Chief would be handling Taylor's vacation time. Taylor responded and denied this, repeating that he objected to the idea that he intended for Ms. Clark to read that message.

-15-

75. At this point Vice President Sorka spoke and objected to Chief Breen's accusation, saying words to the effect: "Chief, if it was not Bill, you would have returned that folder to the person and we would not be here. You are doing this only because it is Bill."

76. The Chief did not deny Vice President Sorka's statement, as he would be expected to do if it were incorrect. Instead, he turned to the subject of the email reply that Taylor sent, stating "Strong work Chief!" in response to Assistant Chief Gogan's email implementing a mask mandate. The Chief handed Taylor a copy of the email exchange in that regard of December 29, 2021, referenced above. The Chief asked Taylor whether Taylor understood that others may think Taylor meant that sarcastically. Taylor said words to the effect: "No Chief. You know where I stand on that issue. You know that was meant as congratulatory."

77. The Chief then asked Taylor how he should handle the situation, claiming the Union's members allegedly were approaching the Chief and expressing objections to Taylor's email response to the Assistant Chief. Taylor responded, saying he did not think that was true. The Chief asked whether Taylor was accusing him of lying, and Taylor responded with words to the effect: "No, but I don't think members are coming to you and reporting their feelings about my emails to you."

78. The Chief then asked Taylor whether he recalled receiving an email from Battalion Chief Kenneth MacEwen, saying he was "perplexed" by the email, and Taylor confirmed he did receive the email. The Chief asked whether Taylor responded to MacEwen, and Taylor responded with words to the effect: "No. I didn't as a matter of fact. I am perplexed by his perplexion, and so I did not reply to him."

79. The Chief then held up the order that he gave to Taylor at the meeting in October 2021, reviewed above, barring Taylor from using the City's email system, and gave Taylor a copy of the order again.

-16-

80.     The Chief then stated: "Do you recall this order? I ordered you not to use the City email. I have no reason to provide you with a platform for Union activity." Taylor responded that he had used the City's email for years and never questioned previously about his use of the City's email.

81.     The Chief then ended the meeting, saying he was directing Taylor escorted off the premises; that he was to pick up his personal items; and that he was on administrative leave pending investigation of Taylor's activities.

*Retaliatory Disciplinary Charges Against Taylor in January 2022 for His Exercise of Free Speech Rights*

82.     On January 24, 2022, Union counsel notified City's labor counsel that the Union was planning to file a charge the next day relating to the City's various adverse actions against Taylor, including *inter alia* the City's investigation of Taylor for his emails of October 20, October 21 and December 29, 2021, and prohibition of Taylor's use of the City's email system. The City's labor counsel acknowledged this, and advised that Chief Breen had drafted charges against Taylor and that draft was being reviewed.

83.     On January 25, 2022, Taylor signed a prohibited practice charge on behalf of the Union, docketed by the Department of Labor Relations (the "DLR") as MUP-22-9071, against the City, referencing alleging twelve counts of prohibited practices in violation of Mass. Gen. Laws ch. 150E §10(a)(1), 10(a)(3), and 10(a)(5).

84.     On January 25, 2022, the City mailed a letter dated "January 24, 2022" to Taylor by certified mail, return receipt requested. Post marking on package showing it was sent on January 25, 2022. The package was delivered by the United States Postal Service to Taylor the next day, January 26, 2022.

85.     On March 29, 2022 the DLR held an investigative conference regarding the aforementioned DLR charge MUP-22-9071 before DLR Hearing Officer Carey Shockey. At the

-17-

hearing, Union counsel presented the case on behalf of the Union, and Taylor was present at the hearing.

86. The letter dated "January 24, 2022" that was mailed on January 25 and delivered to Taylor on January 26, 2022 was authored by Chief Breen and specified disciplinary charges against Taylor relating to six dates.

87. The first specification related to an event on September 28, 2021 -- four months prior to the aforementioned disciplinary letter delivered on January 26, 2022. The Chief alleged that on September 28, 2021 Taylor improperly took paid leave for the first four hours of his shift as "union business" without providing proper seven-day notice.

88. The second specification related to aforementioned emails that Taylor sent on October 20 and 21, 2021 -- three months prior to the disciplinary charges delivered to Taylor on January 26, 2022 -- where Taylor, on behalf of the Union: (a) criticized the Chief for failing to join in the acknowledgement of the retirement of a longtime firefighter and Secretary of the Union, Joe Vento; and (b) criticized the Chief for the Chief's prior reassignment of firefighters and officers in July 2021 that lead to a grievance and arbitration being filed, and commending the Assistant Chief Gogan for his recent reassignments that followed past practice.

89. The third specification claimed that on October 25, 2021 -- three months prior to the disciplinary charges delivered to Taylor on January 26, 2022 -- Taylor improperly used vacation time, rather than union leave, to attend a state meeting of the Professional Firefighters of Massachusetts ("PFFM") on October 25, 2021.

90. The fourth specification claimed that on October 30, 2021 -- three months prior to the disciplinary charges delivered to Taylor on January 26, 2022 -- Taylor told a nurse "shut your mouth" in response to a nurse berating Taylor and other firefighters for affixing a mask to a patient, and criticizing Taylor and other firefighters for their compliance with rules that required that they

-18-

wear a mask as they treated a patient in responding to a healthcare emergency at the Marlborough Hills Healthcare facility.

91.     The fifth specification alleged that in May 2021 -- eight months prior to the disciplinary charges delivered to Taylor on January 26, 2022 -- Taylor wrote "C U next Tuesday" on a manilla folder that he left in an office at the fire station. The Chief alleged in the disciplinary notice that the notation was concerning because the first letter of the words correlated with the four letters of a derogatory word directed at women, and that it was "unprofessional and unacceptable behavior of a fire officer and was more likely aimed at our Finance Assistant."

92.     The sixth specification alleged that on December 29, 2021 -- one month prior to the disciplinary charges delivered to Taylor on January 26, 2022 -- Taylor violated the prohibition on his use of the email system, and transmitted an email stating "Strong Work Chief!" in response to the Assistant Chief's implementation of an order mandating that employees wear masks while at work. The Chief in the disciplinary letter speculated that this was sarcastic criticism of the order rather than praise, and therefore inappropriate.

93.     Among other things Chief Breen's disciplinary charges letter dated January 24, 2022 issued to Taylor contains a blatantly false statement as follows: "You have already received progressive discipline *including verbal warnings, written warnings*, and a suspension (See MFD-18)."

94.     This statement is false because Taylor's only prior counseling was a letter dated March 19, 2018; his record did not include "verbal warnings, written warnings"; and he never served a suspension referenced in the counseling correspondence dated March 19, 2018. This is established by Chief Breen's own findings in the counseling correspondence dated March 19, 2018 where Chief Breen states his conclusion that there was no such prior discipline issued to Taylor, as follows: " I acknowledge and accept your statement that you never received these disciplinary

-19-

warnings. Therefore, I will not consider these unfiled written warnings in judging past disciplinary history."

95.     The January 24, 2022 disciplinary charges letter concludes by advising Taylor that the Chief is recommending that he be demoted from lieutenant to firefighter, and serve a 60-day disciplinary suspension, and that a hearing will be convened by the Mayor to hear evidence and make a decision upon such recommendations.

96.     The January 24, 2022 disciplinary charges letter also concluded by stating: "Until such hearing is scheduled, you will remain on ADMINISTRATIVE LEAVE with pay. While on paid administrative leave, you cannot report for duty in any capacity, must avoid our fire stations and cannot wear a Marlborough Fire Department uniform."

*Supplemental Retaliatory Disciplinary Charges Against Taylor in February 2022 for His Exercise of Free Speech Rights in Wearing a "Class A" Dress Uniform*

97.     On January 20, 2022, Taylor transmitted an email to employees in the bargaining unit under the subject "Death of former President Vincent Harpin," and announced the death of Vincent Harpin (former President of the Union).

98.     On Sunday January 30, 2022, Taylor attended the funeral proceedings for the aforementioned deceased Vincent Harpin. In doing so, Taylor wore his "Class A Dress Uniform." This specific uniform is part of the identity of a firefighter and accordingly is formal apparel that firefighters: (a) wear to somber or other important ceremonies; (b) wear when standing in line next to a casket in a ceremony called a "casket watch" (lined up perpendicular to the casket across from the family) and when formally opening doors for individuals attending the funeral; (c) never wear for active duty, including in the fire station, fighting fires, or addressing emergencies; and (c) wear when they are laid to rest in a casket.

-20-

99.     The deceased Vincent Harpin was wearing his Class A dress uniform as he lay in his casket, and Taylor wore the Class A dress uniform in performing the casket watch and door-opening ceremonies.

100.    There is no requirement by the City that a firefighter wear a Class A dress uniform with a "Marlborough Firefighters" patch affixed on the shoulder of the uniform coat; for example, a firefighter could affix a patch that has no reference to Marlborough and only references the state fire organization.

101.    By letter dated February 11, 2022 Chief Breen notified Mayor Vigeant, of "supplemental information" -- adding two further specifications (adding to the six specifications provided in the Chief's letter dated January 24, 2022) as follows: the seventh specification related to the aforementioned email sent by Taylor on January 20, 2022 about the funeral of deceased firefighter Vincent Harpin; and the eighth specification related to Taylor wearing a Class A dress uniform on January 30, 2022 at the funeral of Vincent Harpin.

102.    The Chief claimed that these actions violated the Chief's order to Taylor in the January 24, 2022 letter that he not wear his Marlborough Firefighter uniform, and prior order that he not use the City's email system.  Based upon these two additional specifications, the Chief notified the Mayor that the Chief was changing his recommendation from a demotion and 60-day suspension of Taylor (as listed in the January 24, 2022 disciplinary charges letter) to demotion and termination of Taylor's employment.

***Retaliatory Disciplinary Hearing in March 2022***

103.    By letter dated March 3, 2022, the Mayor Vigeant, notified Taylor of a hearing to be held on March 22, 2022 regarding the disciplinary charges contained in Chief Breen's letter dated January 24, 2022 and supplemental information dated February 11, 2022.

-21-

104.     A hearing was held before a hearing officer designated by the Mayor on March 11, 2022.

105.     The hearing was public, per the request of Taylor, and approximately 150 firefighters from across the state attended to show support for Taylor, and protest the City's retaliation against him for his union activity.

106.     For the first time at the hearing, a *ninth* specification was alleged against Taylor, that on February 27, 2022, he attended a meeting at the Fire Station.

107.     At the hearing, the City played a video showing Taylor present at the fire station for a celebration organized by the Union on February 27, 2022 relating to the last day on the job and the retirement of union-member David D'Amico.

108.     Taylor was present at the fire station on February 27, 2020 and also accessed the union office to gather paperwork.

***Demotion and Termination of Taylor in April 2022***

109.     By letter dated April 6, 2022, from Mayor Vigeant to Taylor, the City notified Taylor that the City decided in favor of Chief Breen's recommendation, and was demoting him from lieutenant to firefighter and terminating his employment.

110.     The April 6, 2022 termination letter also advised that the Mayor adopted a hearing officer's report dated April 5, 2022, issued after the March 11, 2022 hearing about the ten specifications alleged against Taylor.

111.     The hearing officer's report sustained *eight* of the *nine* specifications that Chief Breen identified in his letter dated January 24, 2022, supplemental information dated February 11, 2022, and that the City otherwise presented at the hearing. The hearing officer's report notes that the third specification did not form a basis for the hearing officer's recommendation of demotion to firefighter and termination because the Chief at the March 11, 2022 hearing admitted that he did

not rely upon the third specification (relating to Taylor allegedly not properly using a union leave day to attend a PFFM convention) in making his recommendation for demotion and termination.

112.    In the conclusion of the hearing officer's report, the hearing officer confirmed that he relied upon Chief Breen's *blatantly false* representation that Taylor had multiple prior disciplinary actions. In that regard, the hearing officer wrote that Taylor was subject to a "significant number in of past instances of discipline imposed." However, as detailed above, in fact a counseling letter dated March 19, 2018 confirms that there was no prior discipline issued to Taylor.

113.    The hearing officer also relied upon the charge -- made for the first time at the March 11, 2022 hearing -- relating to Taylor's presence at the station on February 27, 2022 at time of Battalion Chief D'Amico's last day on the job and retirement. The hearing officer claimed that this violated Chief Breen's direction to Taylor in the January 24, 2022 letter that Taylor "avoid" the station.

### Denial of Access to Public Classroom of Fire Station for Monthly Union Meetings

114.    For the last 35 years, the Union has held its monthly membership meeting on the fourth Tuesday of the month, and since approximately 1995 through 1996 when the Central Fire Station was opened the monthly Union membership meeting has been held in the public classroom of the Central Fire Station.

115.    As President of the Union, Taylor has presided over such monthly Union membership meetings.

116.    The public classroom is also used for several other purposes and by persons other than employees of the City, such as community education related and unrelated to fire prevention, various clubs including regular meetings of a knitting club. The public class has its own entrance that allows non-employees to enter and leave without entering the other parts of the fire station.

-23-

117.    On Tuesday April 26, 2022, the fourth Tuesday of April, the Union held its regular monthly Union meeting and Taylor was present and presided over the meeting.

118.    In response to the Union's attempt to resolve non-access by Taylor to the Union office, the City's counsel advised that the City was prohibiting Taylor from entering the station for any purpose, and that this included not only the Union office, but also the public meeting room. Further, the City advised that it learned of Taylor's attendance at the monthly Union meeting on April 26, 2022 in the public meeting room and reiterated that Taylor was prohibited from even attending the meeting in the public meeting room.

***Pending Charge of Prohibited Practice***

119.    The Union has filed a Charge of Prohibited Practice under Mass. Gen. Laws ch. 150E against the City with the Massachusetts Department of Labor Relations ("DLR") predicated on facts that overlap with the facts alleged in this Complaint and asserting violations of several provisions of the Commonwealth's labor laws.

120.    The DLR, however, does not provide a forum for adjudication of the Union's Constitutional claims against the City brought pursuant to 42 U.S.C., § 1983 and Mass. Gen. Laws ch. 12, §§ 11H & 11I. See *Malden Education Association*, 15 MLC 1121, 1122 (1988) ("The Commission has authority to enforce compliance with G.L. c. 150E and G. L. c. 150A . . . The Commission's complaints allege only violations of the statutes that the Commission administers rather than violations of the United States Constitution.")

121.    The DLR will take into account Constitutional considerations only so far as necessary to ensure that its implementation of the Commonwealth's labor laws avoids the risk of a Constitutional violation. *Id.* ("The Commission's enforcement of the statutes is undertaken with appreciation for the constitutional rights of the parties so that the state statutes are enforced, and the

state's labor policies promoted, consistent with the state and federal court interpretations of the parties' conditional rights").

122. The Union pursues its Constitutional claims against the City in this forum in the absence of available remedies for the Union to vindicate its Constitutional rights at the DLR.

**Count I**
**(Civil Rights under 42 U.S.C., § 1983)**

123. Plaintiffs repeat, reallege and incorporate by reference as if set forth hereto in their entirety Paragraphs 1 through 122 of this Complaint.

124. Chief Breen and Mayor Vigenat, in their official and individual capacities, and the City, under color of law, have engaged in impermissible retaliation, attempted to interfere with, and interfered with Plaintiffs' exercise and enjoyment of rights secured by the constitution and laws of the United States, including Plaintiffs' right to free speech and freedom of association, entitling Plaintiffs to relief under 42 U.S.C. § 1983.

125. Taylor was terminated as retaliation for his expression protected by the First Amendment.

126. A public employee's speech is afforded First Amendment protection if it concerns a "matter of public concern" and the employee is speaking as a private citizen rather than a public employee.

127. The City retaliated against Taylor for three separate expressive acts: (1) the so-called "bomb drop" email that mentions "crew integrity"; (2) the "Strong Work Chief!" email; and (3) Taylor's wearing of a Class A dress uniform to a funeral. None of these communications are even arguably an aspect of Taylor's duties as a firefighter.

128. The co-called "bomb drop" email, or at least part of it, relates to a matter of public concern, specifically, Taylor's worry that, among other things, the Chief's transfer practice would

-25-

disrupt "crew integrity", which bears directly on public safety, as attested by use of the phrase "crew integrity" as a factor in judging the safety and operational effectiveness of fire departments.

129. A discussion of fire operations that bears directly on public safety represents a matter of "inherent concern to the electorate." *Curran v. Cousins*, 509 F.3d 36 (1st Cir. 2007).

130. Also, the remainder of Taylor's email arguably concerns union activity and, therefore, should qualify as a matter of public concern and rights of free association. Taylor signs the email as a Union President and emphasizes the classic values of unionism, "courtesy, seniority, and respect."

131. Taylor's "Strong Work Chief!" email also relates to a matter of central public concern at the time of its sending, specifically COVID-19 PPE policies.

132. Masking at the fire station would necessarily implicate general public safety because of the transmissibility of COVID-19.

133. Taylor was known as a union officer and workplace safety is a core union concern.

134. With respect to Taylor wearing a Class A uniform, clothing merits First Amendment protection when it has "an intent convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. State of Wash.*, 418 U.S. 405, 411-12 (1974).

135. Taken in the context of a funeral, donning a Class A dress uniform radiates a message of solidarity, respect, loyalty, and dedication to duty. These values are clear and easily understood by the public in the grave context of a funeral. Such symbolism is protected expression.

136. Defendants would not have taken the adverse actions they took against Taylor if he had not engaged in protected expression and association.

137.    If Taylor had not engaged in protected expression and association, the sum total of his alleged infractions would be substantially smaller and, therefore, the City would not have concluded that termination was appropriate.

138.    Defendants would not have scheduled a disciplinary hearing if not for Taylor's emails, which constitute protected speech under the First Amendment. Other alleged infractions of Taylor (beyond those that constitute protected First Amendment activity) are trivial in nature.

139.    Indeed, the timing and sequence of the supplementary recommendation of dismissal of Taylor amounts to an admission that, until Taylor wore his Class A dress uniform, the City did not believe termination was warranted.

140.    The exclusion of Taylor from the Fire Station's public meeting place is also a First Amendment violation and impermissibly restricts free association.

141.    The City has created a designated public forum by permitting a myriad of speakers and groups to utilize the classroom space inside the fire station without refusing access to any proposed speakers before Taylor.

142.    The City has allowed a wide range of organizations to use the space, such as: the Union, a knitting group, the civil air patrol, food pantry drives, the Algonquin Amateur Radio Club, and political speakers hosted by Local 1714, including: current Mayor Vigeant, past mayoral candidates, city council candidates, and Marlborough State Representative Danielle Gregoire.

143.    A room used for such meetings is, at least, minimally compatible with expressive purposes.

144.    There does not appear to be any publicly available policy regarding who can and cannot make use of this space. This absence of a policy is especially striking because the City has promulgated policies regarding admission to public meeting spaces in the City's library.

-27-

145. Strict scrutiny should govern a constitutional evaluation of Taylor's exclusion from the meeting room.

146. The exclusion of Taylor from the Fire Station's public meeting place constitutes impermissible viewpoint discrimination.

147. The City's exclusion of Taylor from the public meeting place violates the First Amendment because it denies Taylor access because the City does not care for his point of view.

148. Viewpoint discrimination is perhaps the gravest sin the government can commit against the First Amendment and, as such, receives even greater than strict scrutiny.

149. There is substantial evidence that the City is barring Taylor from the meeting room because it disapproves of his viewpoint.

150. For example, in his January 24, 2022 disciplinary recommendation, Chief Breen writes: "I cannot understand your propensity for being vexatious, ill-mannered, and outrageously negative."

151. Elsewhere in the same document, the Chief accuses Taylor of "gross insubordination and voicing outrageous statements."

152. As a result of Defendants' actions against him, Taylor has been damaged including by the loss of pay, seniority and other contractual benefits. Taylor has also suffered garden variety emotional distress as a result of Defendants' actions and his Constitutional rights have been impaired. By retaliating against Taylor and by taking actions against Taylor, the City has also harmed the Union and interfered with the Union's right to free expression and its right to free association. The Union has also been damaged by having been forced to pay for alternative meeting space due to the City's actions limiting Taylor's use of the public meeting place.

## Count II
### (Civil Rights under Mass. Gen. Laws ch. 12, §§ 11H & 11I)

153. Plaintiffs repeat, reallege and incorporate by reference as if set forth hereto in their entirety Paragraphs 1 through 152 of this Complaint.

154. Chief Breen and Mayor Vigenat, in their official and individual capacities, and the City, under color of law, have engaged in impermissible retaliation, attempted to interfere with, and interfered with Plaintiffs' exercise and enjoyment of rights secured by the constitution and laws of the United States, and the constitution and laws of the Commonwealth, by threats, intimidation and coercion. Including Plaintiffs' right to free speech, entitling Plaintiffs to relief under Mass. Gen. Laws ch. 12, §§ 11H & 11I.

155. Article 16 of the Massachusetts State Constitution provides that: "The liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this commonwealth. The right of free speech shall not be abridged."

156. The protections in Article 16 may extend beyond the protections of the First Amendment. Article 16 contains more protections than the First Amendment.

157. The City's actions against Taylor and the Union constitute a violation of their rights under Article 16.

## Count III
### (Injunction)

158. Plaintiffs repeat, reallege and incorporate by reference as if set forth hereto in their entirety Paragraphs 1 through 157 of this Complaint.

159. Plaintiffs will be irreparably harmed if Defendants Chief Breen and Mayor Vigenat, in their official and individual capacities, and the City, under color of law, continue to engage in impermissible retaliation, attempts to interfere with, and interference with Plaintiffs' exercise and

-29-

enjoyment of rights secured by the constitution and laws of the United States, and the constitution and laws of the Commonwealth.

160.    Taylor further will be irreparably harmed if: he is not restored to his position as lieutenant, retroactive to the date of his unlawful termination, April 6, 2022; he is not made whole for all losses suffered, including but not limited to backpay, seniority, and any other contractual benefits retroactive to the date of his unlawful termination, April 6, 2022; and the termination letter, and the hearing officer report and the documents that were relied upon for the termination are not rescinded and removed from his personnel record.

161.    There is no adequate remedy at law.

162.    Plaintiffs are entitled to injunctive relief enjoining Defendants from any further violations of Plaintiffs' constitutional rights, directing Defendants to allow Taylor access to the Fire Station's public meeting place; requiring Defendants to restore Taylor to his position as lieutenant, retroactive to the date of his unlawful termination, April 6, 2022; ordering Defendants to make Taylor whole for all losses suffered, including but not limited to backpay, seniority, and any other contractual benefits retroactive to the date of his unlawful termination, April 6, 2022; and requiring Defendants to rescind and remove from Taylor's personnel record the termination letter, the hearing officer report and the documents that were relied upon for the termination

WHEREFORE, Plaintiffs request that judgment enter:

(i)    Awarding Plaintiffs monetary damages, together with interest and costs;

(ii)    Granting counsel for Plaintiffs their reasonable attorneys' fees and expenses;

(iii)    Entering injunctive relief: enjoining Defendants from any further violations of Plaintiffs' constitutional rights; directing Defendants to allow Taylor access to the Fire Station's public meeting place; requiring Defendants to restore Taylor to his position as lieutenant, retroactive to the date of his unlawful termination, April 6, 2022; ordering Defendants to make

Taylor whole for all losses suffered, including but not limited to backpay, seniority, and any other contractual benefits retroactive to the date of his unlawful termination, April 6, 2022; and requiring Defendants to rescind and remove from Taylor's personnel record the termination letter, the hearing officer report and the documents that were relied upon for the termination; and

(iv)    Providing such other relief as the Court deems just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE

Barry Pollack, BBO# 642064
Peter J. Duffy, BBO# 566682
Philip Rakhunov, BBO# 663746
POLLACK SOLOMON DUFFY LLP
101 Huntington Avenue, Suite 530
Boston, MA 02199
617-439-9800 (tel)
617-960-0490 (fax)
pduffy@psdfirm.com
Attorneys for Plaintiffs

Dated:  September 16, 2022